THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ORESTE BELVEDERE, JR., *et al.*, Defendants-Appellants.

First District (5th Division)    Nos. 77-908, 77-948 cons.

Opinion filed May 18, 1979.

1000

Julius Lucius Echeles, of Chicago, for appellant Oreste Belvedere, Jr.

Jerold S. Solovy and Christopher J. McElroy, both of Chicago (Jenner & Block, of counsel), for appellant Robert Bailey, Jr.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:
Following a jury trial, defendants were each found guilty of the

murder of Mark Butterly, the attempt murder of John Sigle, and the aggravated battery of John Sigle. (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1, 9—1 and 8—4, and 12—4(b)(1).) Defendant Belvedere was also found guilty of the attempt murder of John Beuchner. Defendants were sentenced to terms of 75 to 200 years for the murder, 25 to 50 years for the attempt murder of John Sigle, and 3 to 10 years for the aggravated battery. Additionally defendant Belvedere was sentenced to 25 to 50 years for the attempt murder of John Beuchner. The sentences are to run concurrently.

In consolidated appeals, defendants contend that they should be granted a new trial because (1) they were denied a fair trial when the prosecutor was permitted to elicit testimony from a State's witness regarding defendant Belvedere's alleged attempt to coerce the witness to testify favorably in his behalf, and to examine the witness as to whether the person who supplied her heroin, with which she tried to commit suicide, was a friend of defendants; (2) they were denied a fair trial because the court erred in permitting a former prosecutor to testify, express his personal belief as to defendants' guilt, and relate the hearsay testimony of ten other witnesses; (3) the trial court improperly permitted the prosecution to introduce into evidence defendant Bailey's prior narcotic conviction; (4) the prosecutors made prejudicial remarks during their closing arguments; and (5) the sentences were excessive. We affirm the trial court.

During the early morning hours of August 3, 1975, while in the vicinity of the Hasty Grill Restaurant, Mark Butterly was killed after having been repeatedly struck by defendants with an automobile jack and jack handle, and John Sigle was allegedly beaten with the same automobile jack and jack handle. Moreover, John Buechner, during the same incident, was struck by an automobile operated by defendants. The pertinent testimony follows.

Joseph Peters testified that on August 3, he worked as a part time grill man at the Hasty Grill which is located at 1801 West North Avenue, Melrose Park, Illinois. He arrived at the Hasty Grill around 5:30 a.m. to relieve Bill Parker, the regular grill man. When he entered the grill he saw four boys on the west end and two boys and two girls on the east end. After he washed up, he came out of the washroom and noticed the place was empty except for Parker, the grill man, and a young girl. He looked outside and on the far west side of the parking lot, near the funeral parlor, he heard shouting and saw two men in a white convertible Buick driving back and forth and saw the Buick "brush" a boy. The boys got away from the car and then the car turned around and knocked two of the boys out on North Avenue. Later he saw someone striking a Volkswagen on the driver's side with a jack handle. Then he observed the fellow with

the jack handle hit the young boy in the head as the boy was getting out of the Volkswagen. The boy was hit with the jack handle again and he fell to the ground. Then the other fellow hit the boy two or three times on the head with the jack part while the boy was on the ground. Peters tried to make a telephone call to the police, but the girl in the grill tried to prevent him from doing so by hitting him with the telephone receiver. Nevertheless, he finally contacted the police. After the police arrived, he went outside and saw the boy on the ground with blood coming out of his mouth. He later identified the man he saw with the full jack as Belvedere.

Cynthia Saccomanno (hereinafter Cindy) testified that on August 3, she was with Ursula Rumas at the Tenement West lounge and that defendants arrived at about 3 a.m. She had known Belvedere two years and Bailey nine months. Each of them had several alcoholic drinks at the lounge. They left in Belvedere's white convertible Buick and drove to the Hasty Grill. While sitting at the counter Cindy got into an argument with Belvedere and he punched her in the mouth. She fell to the floor. Belvedere then dragged her to the parking lot and started beating her. She heard somebody say "don't hit a girl, she's bleeding, bring her to the hospital or call an ambulance." After the beating, she started walking and reached 19th Avenue and Bloomingdale in Melrose Park when a car, occupied by defendants, stopped. Bailey got out of the car and started kicking her in the face with his foot. He knocked her to the ground and kicked her three times in the face.

On cross-examination she admitted that when she left the Tenement West lounge with defendants, all of them were under the influence of intoxicating liquor.

Police Officer Michael Klugger testified that after receiving a radio dispatch call of a murder at the Hasty Grill, he proceeded westbound on North Avenue and as he approached 15th Avenue he observed a white Buick convertible coming southbound on 15th; it made a left-hand turn through the red light and proceeded east on North Avenue. There were two white males in the front seat of the vehicle, and the driver of the automobile looked directly at him. He identified the driver as Belvedere. Upon his arrival at the Hasty Grill he observed the decedent lying on his right side in front of a Volkswagen vehicle. The victim's head was in a pool of blood. When he looked at the vehicle, he observed that the rear window on the driver's side was broken out.

John Beuchner testified that on August 2, he was a waiter at the Rusty Scupper Restaurant at O'Hare Plaza. Decedent had formerly worked as a waiter at this restaurant but had been transferred to the Rusty Scupper Restaurant on Clark Street in Chicago. Decedent and John Sigle, also a waiter at the Rusty Scupper on Clark Street, came by the O'Hare Plaza restaurant before it closed. They had planned to attend a going-away

party for a cook who was leaving for college. The party was to be held at the home of the manager of the O'Hare restaurant. Beuchner arrived at the party at 2:30 a.m. and John Sigle, Pat Angelo and decedent were already there. He said that he had imbibed one rum and coke while still at the restaurant and had consumed one beer at the party. He left the party at 4:30 a.m. with Sigle, Angelo and decedent who was driving Sigle's Volkswagen and together they went to the Hasty Grill. When they arrived, Beuchner ordered breakfast. He then noticed a man dragging a girl by her hair out of the door. As the girl was dragged out, she hit against the side of the door and he heard decedent say, "That is no way to treat a girl. What are you doing? Are you beating up on this girl?" He heard the other man holding the door reply, "Mind your own business. It does not concern you." He identified Belvedere as the man he saw dragging the girl out of the Hasty Grill and Bailey as the man he saw standing holding the door open.

Beuchner further testified that he observed a trickle of blood coming from the girl's mouth. He saw her get up, swear at the shorter man and walk away. He went back into the restaurant. He then heard Sigle say, "Beuchner, they're beating on the girl. Let's go out there." He followed Sigle outside and saw defendants, Angelo and decedent facing each other. He heard both Angelo and decedent tell defendants to get into their car and leave. Decedent told them to "get the hell out of here." Belvedere then got in the driver's side and Bailey got in on the passenger's side of a white two-door convertible Buick. The car was put in drive, proceeded forward, and made a "swipe" at the four of them. They dodged the car. The driver stopped, put the car in reverse and made another "swipe" at them. Beuchner ran with Sigle and Angelo to the wall by the funeral home; decedent, however, remained out on the drive. The car continued to attempt to strike decedent. Beuchner ran out to decedent and was standing beside him when the car struck them both and knocked them down. They got up and the car then made another "swipe" at them, just missing. He saw decedent and Sigle get into the Volkswagen, but since he had the license number of the white convertible he started for the Hasty Grill. He had one shoe off and his leg felt asleep and twice as large as was normal and he was hobbling. He looked over his shoulder and saw two men, whom he later identified as Belvedere and Bailey, beating on the driver's side of the Volkswagen. When he got into the restaurant, he shouted for somebody to call the police. He went outside the restaurant and saw decedent on the ground with his head lying in a pool of blood. He observed that Sigle's back and hand were cut.

Patrick John Angelo testified that on August 2, he was a waiter at the O'Hare Rusty Scupper Restaurant and was a graduate of Loyola University where he had met decedent. He also attended the same party

as Beuchner, Sigle and the decedent. While at the party he had one beer. He left the party at approximately 4:30 a.m. or 4:45 a.m. with Beuchner, Sigle and decedent in Sigle's Volkswagen automobile. They went to the Hasty Grill. At the Hasty Grill, he saw a man hit a girl and drag her by her hair to the door. He observed decedent get up from his seat and go over to the two men who were with the girl and tell them that they should not hit a lady. He heard one of the men say "Stay away, back off. You are going to get hurt and it's none of your business." He identified Belvedere as the man who struck the girl and Bailey as the person who spoke to decedent. He further testified that he pushed decedent back and told him to leave the men alone. He looked out the side window of the restaurant and saw a white Buick convertible pull up to the girl who previously had been hit. Belvedere, the driver, got out, punched the girl in the face and kicked her. Angelo stated that he walked out of the restaurant, went over to the automobile, and told Belvedere, who was standing over the girl, to leave and that the police had been called. He was followed to the automobile by decedent who asked "Why are you hitting this girl? What in the hell is wrong with you?" He observed that Beuchner and Sigle had also arrived at the car. Belvedere then got in the driver's seat and Bailey into the passenger's side of the car. He saw the car come toward him. He ran toward the Hasty Grill. He saw Belvedere back the car up, then go forward, and hit Beuchner and decedent with the front of the car, lifting them onto the top of the hood. The car then took off heading west. He saw Beuchner and Sigle get up and he went over to them. He then walked to the Hasty Grill to call the police. While he was on the phone, a girl who had remained in the restaurant swore at him and scratched him on the neck and ear. He pushed her into the aisle and she fell on a chair. He told the grill man to hold her while he made the call. He looked out the window and saw Belvedere with a jack and Bailey with a tire iron. He observed decedent sitting in the Volkswagen and then standing up with his hands covering his face. Belvedere then hit decedent on his head three times with the jack and Bailey hit decedent on his legs with the tire iron. As Angelo exited the Hasty Grill, he saw Belvedere with the full jack standing over decedent near his head and Bailey with the jack handle standing near decedent's legs. Bailey looked at him and took a few steps toward him. He saw Sigle, with his hand and back bloody, and told him to run and he ran with him. He and Sigle returned from a nearby apartment complex where they had gone for help and they went towards the Hasty Grill. As he approached the Hasty Grill he noticed police cars, saw decedent lying in a pool of blood, and went and felt his pulse and temple. Decedent had no pulse and he was not breathing. Angelo testified that he observed that the Volkswagen automobile roof on the driver's side was collapsed and the window was broken. He viewed photographs at

the Melrose Park Police Station and identified Belvedere. On September 25, he observed a lineup held at the Cook County Jail and identified Bailey.

On cross-examination, Angelo admitted that he failed to tell the grand jury that Bailey hit decedent on the legs with the tire iron, and he conceded that two days before trial was the first time he had ever said that Bailey hit decedent on the legs with the tire iron.

John Sigle testified that in August of 1975, he was employed as an urban planner for the City of Chicago and as a waiter at the Rusty Scupper Warehouse in Chicago. While working there, he had become acquainted with Angelo, Beuchner, and decedent. On August 2, Sigle owned a 1973 Volkswagen automobile and loaned it to decedent and another person to attend a party for one of the cooks. Sigle left the Rusty Scupper about 12:30 a.m. and rode with a friend to the Rusty Scupper located in the O'Hare airport area. When he arrived there he saw decedent, Angelo and Beuchner. The four of them then went to the night manager's apartment for a party. Around 4:30 or 4:45 a.m., they left the party and went to the Hasty Grill. They rode in Sigle's Volkswagen which was driven by decedent. When they arrived at the Hasty Grill they ordered breakfast. While waiting for breakfast Sigle heard a commotion near the door area of the grill. He looked towards the counter and saw a lady being dragged by her hair across the floor. He identified Belvedere as the man who dragged the woman across the floor and Bailey as the man who was standing by the door holding it open. Decedent went to the door and told Belvedere to "lay off the girl and that was no way to treat a lady." Sigle heard Bailey tell decedent to "mind his own business or he'd get hurt or he'd get in trouble." Afterwards, the girl, who was bleeding profusely from her mouth and face, got up and wandered off. Belvedere and Bailey then got into a white Buick convertible. Sigle went back to the counter and sat down, and while he was waiting to be served, he heard Angelo say that they were "beating on" the girl again. Sigle looked into the parking lot and observed that the car had stopped and that Belvedere was outside of the car and the girl was on the ground. Sigle, Angelo, Beuchner and decedent went outside to help the girl. When Sigle arrived at the scene, he saw Belvedere beating the girl who was lying on the ground. The girl then got up and walked away. Decedent told Belvedere to leave the girl alone; Angelo told Belvedere that the police had been notified, were on their way to the scene and that he should get out of the area as quickly as possible. Belvedere began swearing, and then he and Bailey got into the Buick. Belvedere started the auto and began driving back and forth attempting to hit Sigle, Angelo, Beuchner and decedent. Sigle, Angelo and Beuchner ran to a funeral parlor north of the auto. Decedent was left standing by himself. While they were running, Belvedere drove the car in

their direction, then put the car in reverse, started the car forward again and struck decedent and Beuchner. Both decedent and Beuchner were knocked onto North Avenue. The car left the parking lot and Sigle went over to them. Both of them were shaken and Beuchner complained that his leg hurt and he was holding his shoe. Sigle and decedent entered the Volkswagen auto and sat down, leaving the doors open. As Sigle was reaching for a pencil and paper to write down the license number of the auto, he heard a crashing sound and felt a blow to his left hand. He moved toward decedent and saw that Belvedere had hit him on the hand and hip with a car jack. He watched Bailey go around the car, and pull decedent out of the car. Belvedere also appeared on the driver's side of the car. Sigle got out of his side of the car and saw Bailey hit decedent on the head with a tire jack handle; decedent fell to the ground and Belvedere and Bailey then struck him with a tire jack and tire iron. Sigle's left eye and hip were injured and he ran with Angelo to some apartments across the street. When he returned to the scene, the police were there and decedent was lying on the ground in his blood. Sigle was taken to the hospital where it was disclosed that he had sustained a lacerated tendon on his left hand, eye lacerations and a fractured pelvis.

On cross-examination, Sigle admitted that he never testified before the grand jury that he saw Bailey pull decedent out of the car.

Ursula Rumas testified that on August 3, she had known Belvedere about eight or nine months and was "going out" with him. She also had known Bailey for about six years. She was with Belvedere, Bailey and Cindy Saccomanno at the Hasty Grill at about 5 a.m. on August 3. Belvedere told Cindy to shut up and she replied, "No guy is going to tell me to shut up." She stood up and Belvedere hit her, knocked her to the ground, and caused her mouth to bleed. A young man asked Ursula if she needed any help. She replied that she needed no help, and then the man told Belvedere and Bailey "that was no way to treat a lady." Belvedere grabbed Cindy by the hair and Bailey stood in front of her and they backed out. Ursula began crying while standing at the counter, looked towards her left, and saw Cindy walking towards the funeral parlor. She next heard a car screeching and glass breaking. As she continued to look out the window, she saw a Volkswagen auto and someone holding a crowbar on the driver's side of the car, but she could not see the person's face. A man ran in and said "[c]all the police." She saw Belvedere holding someone with his left hand and a pipe or something with his right. She ran up to the fellow on the phone and told him not to call the police. He knocked her down and then hung up the phone. He picked her up, apologized and went back to use the phone. She put her finger on the phone to tell him not to call the police. He told her that his friend was hurt and that he had to get him to the hospital. She went outside and saw a

body lying alongside the Volkswagen. She walked up, checked his pulse, but could not feel any pulse. The police arrived and took her to Melrose Park Police Station where she gave a statement and was charged with a crime.

On September 30, Ursula appeared in court and the charge that had been placed against her was dismissed. After the dismissal, she received a grand jury subpoena calling for her to appear on October 8. On that day, she talked to Assistant State's Attorney Gertie who told her to return on October 16 with her lawyer and also informed her that the statement given at the Melrose Park Police Department did not "really fit in." On October 16, she did not testify in front of the grand jury but talked to Assistant State's Attorneys DeJohn and Vicaro. She then moved to the home of Pamela Kubes, a girlfriend.

On October 26, in response to a telephone call from Anthony Belvedere, defendant's brother, Ursula and Pamela left the house and went to a discotheque lounge. When she walked into the lounge she saw defendants, Belvedere and Bailey. Anthony walked in and joined defendants, Pam and Ursula at a table. Defendant Belvedere told Ursula that he liked what she had told the Melrose Park Police Department regarding the incident and that he wanted her to tell his lawyer that she saw blood on his face at the time of the incident. Although she did not recall seeing any blood, she agreed to tell his lawyer that she saw blood because she was afraid of him. Belvedere told her that "we should have killed them all." He further told her that he would take her to his lawyer the next day, and if she went, he would buy her things and they would go on a trip. She then left with the other four persons and rode with defendant Belvedere in his car to the Tenement West lounge. After leaving the Tenement West, she went with Belvedere to a restaurant. All five of them left the restaurant and Belvedere took her to his house where he made love to her.

On October 27, Ursula left Belvedere's house and he took her to her parents' home. From her parents' home she went to Cindy's house. She and Cindy then went to Mock's bar. While there, she met a guy who gave her some heroin. She took it and overdosed on it. She said that she injected this heroin in order to kill herself. She had taken heroin four or five years before this incident.

Ursula testified on cross-examination that neither she nor Bailey was under the influence of alcohol at the time of the incident. She also testified that she never told Penny Fuentes about the events at the Hasty Grill. In her evidence deposition, however, she stated that she had "lied" to Penny about the occurrence. Confronted during trial with the prior statement, Ursula testified that she had told the "fake" story to both Penny and Ann

Fuentes. She further stated that she also lied to Pamela Kubes about the events of that morning.

She testified that a guy named Sherman offered her the heroin and that she did not know him but that Cindy did. The heroin consisted of "brown stuff" in a tinfoil packet. She got a kit, which consisted of a hypodermic needle, syringe and spoon, from Sherman and injected the heroin into her arm while in the bathroom. She did not pay for the heroin. She stumbled out to the bar and passed out.

Ursula admitted that in her statement to the Melrose Park Police Department she had said that Bailey was driven home because he was drunk. She also stated that in her police statement she put the crowbar in the hands of someone other than defendants because she was "afraid" of Belvedere.

On redirect examination, the prosecutor asked: "This fellow Sherman that gave you the heroin, you know if he knows either of the two defendants?" The defense objection to the question was sustained and the motion for mistrial was entertained and later denied.

John Gertie, former Assistant State's Attorney, testified that on September 30, he met Ursula Rumas in Oak Park, appeared in court and requested the court to dismiss the charge that had been placed against her. After the court dismissed the charge, an investigator served Ursula with a grand jury subpoena that commanded her to appear before the grand jury on October 8. No promises were made to Ursula; the charges against her were dropped because they could not be proven. On October 8, he had a conversation with her in the presence of her brother. After the conversation, the subpoena was continued to October 16. He told her brother to come back with her on that date, but to bring her attorney. On October 16, he saw her again but did not speak to her since he was on trial and had turned over the case to Assistant State's Attorneys DeJohn and Vicaro.

Gertie denied that he told Ursula what other witnesses had said but he admitted on cross-examination that he did say that other witnesses' versions of the event were different from hers. He also stated that he intended to convey to her that he thought she was lying.

Dr. Robert Stein, a pathologist, who was Director of Forensic Pathology of Cook County, testified that he performed a post-mortem examination of decedent on August 3. He observed several marks of violence consisting of contusions and lacerations about the head and body of the decedent. He testified that the cause of death was a cranial cerebral injury in association with traumatic laceration of the kidney and spleen.

Oreste Belvedere testified that he and Bailey went to the Tenement West lounge in the early morning hours of August 3, and met Ursula and

Cindy. While there, he consumed 8 to 12 shots of gin. Bailey drank about the same amount but he was not drinking gin. Cindy and Ursula also had about the same number of drinks. The four of them left the Tenement West lounge after 5 a.m. and went to the Hasty Grill. They sat at the counter and ordered coffee. Cindy became loud and began complaining about the grill man telling her to shut up. Belvedere then told her to shut up and she started swearing and yelling at him. He lost his temper and slapped her with the back of his hand. She fell, then got up bleeding from her lip, and walked out. He told Bailey, "Let's get out of here." As they walked out, four men got up and followed them out. He and Bailey got into his white Buick and he drove in front of the Hasty Grill. As he got a little past the Hasty Grill, the four men who had followed them out of the grill started kicking his car, calling him names and telling him to "get the hell" out of the car. He got out of his car, and told them to go inside because he and Bailey did not want to fight with them. While he was talking, someone struck him in the mouth, breaking his dental plate and causing him to bleed. Bailey then got out of the car to help him and two of the men jumped on Bailey and started fighting. Belvedere got back into the car, backed up, and tried to turn the car closer to Bailey so that he could enter. Two of the men were struck by the car. Immediately after hitting them, Belvedere slammed on the brakes and the motor died. Bailey then jumped into the car and Belvedere heard someone shout, "Get the golf clubs." He got his jack and tire iron from the floor in the back seat of his car and he and Bailey followed the men toward the grill. One of the men jumped into the Volkswagen and reached for the glove box. Belvedere thought that he was reaching for a gun and yelled to Bailey, "[g]un." Then Belvedere hit the man sitting on the driver's side of the Volkswagen with the jack. He saw Bailey on the ground fighting with the other man. He turned around, swung the jack and knocked the man off Bailey. They then left the area in the car.

On the way to his apartment, they saw Cindy walking down the side street. They stopped, Bailey got out of the car, started talking to her, hit her and then got back in the car. They then drove to Bailey's apartment.

On cross-examination, Belvedere stated that when he approached the Volkswagen he hit the top of the car on the driver's side and broke the window. He admitted that he never saw a gun but thought that he had been struck by something that looked like a blackjack. He testified that he struck decedent once or twice and saw Bailey strike decedent several times with a tire iron. He further admitted that he took the license plates off his Buick and put them on a car belonging to Bailey, and that they took the jack and jack handle with them, but later threw them away on the highway.

Robert Bailey's testimony was substantially the same as Belvedere's

regarding their activities prior to their arriving at the Hasty Grill. He stated that while sitting at the counter one of the girls knocked over her coffee. All of them started laughing and became a little loud. The grill man came over and told them to shut up. Cindy started moaning and saying, "Is he going to tell me to shut up," and Belvedere said to her, "Why don't you shut up." She replied, "No man is going to tell me to shut up." Belvedere then struck her in the face and she fell down. Her mouth was bleeding when she got up and she then ran for the door. Belvedere started for the door and three or four men came up behind him yelling, "That's no way to treat a lady." He told them to be nice and asked them "Why don't you guys mind your business?" He and Belvedere got into the car and Belvedere started driving out when he saw two men on the driver's side of the car and two on the passenger's side kicking the car and saying, "Come on. Get out of the car." Belvedere stopped the car, got out and walked back. Bailey saw that Belvedere's mouth was bleeding. He got out of the car and walked towards Belvedere but did not make it that far because he began fighting with two men on his side of the car. Belvedere jumped back in the car and started driving the car back and forth. While driving the car near to Bailey, he struck two men and knocked them to the ground. Bailey then ran and got in the car. He retrieved a jack handle and Belvedere retrieved a jack from the back seat of the car. They got out of the car and proceeded to the Volkswagen where two men were seated. As he and Belvedere approached the Volkswagen, he heard Belvedere yell, "gun." He did not see a gun that night. He looked into the Volkswagen and saw the man in the driver's seat reaching for the glove compartment. Bailey ran from the driver's side around to the passenger's side of the car. Using the jack handle, he hit the hand of the man reaching for the glove compartment. The man sitting in the passenger's side then tackled him and threw him on his back. Bailey began hitting the man on the back with the jack handle. The man he was fighting with let go and he got up. Belvedere came around to help him and the man let go after he was hit. Bailey was hit on the arm. He and Belvedere ran, jumped in the car, started it and drove away.

While driving, they saw Cindy walking down the street. Belvedere stopped the car and Bailey got out and said, "[b]itch, you caused a lot of trouble." He pushed her down, kicked at her, jumped back in the car, and they then drove off. They went to Bailey's house and Belvedere telephoned the grill, asked for Ursula, and was told that the tall man involved in the incident had died. Bailey observed that Belvedere's dental plate was broken. They left the house, took the license plates off Belvedere's car and put them on Bailey's car, and then left the Chicago area. Bailey threw the jack and handle out of the car on the highway.

The prosecution offered in their rebuttal case the prior Federal

narcotics conviction of Bailey for the purpose of impeaching his credibility. The relevant facts of the conviction were that on August 20, 1971, Bailey pleaded guilty to the Federal offense of unlawfully distributing narcotics. On surrebuttal, Bailey admitted that he had pleaded guilty to that charge.

Bailey had previously made a motion to exclude evidence of his prior conviction on the grounds that it did not pertain to his credibility as a witness and would unduly prejudice him before the jury. Later during the trial, the motion was renewed and denied by the court.

After arguments and instructions, the jury found Belvedere and Bailey guilty of the murder of Mark Butterly, the attempt murder of John Sigle, and the aggravated battery of John Sigle. In addition, the jury found Belvedere guilty of the attempt murder of John Beuchner.

Opinion

I

■■ Defendants contend that the introduction of evidence that defendant Belvedere attempted to coerce and bribe a witness into testifying favorably in his behalf, as well as an inquiry as to the witness' source of heroin denied them a fair trial. In particular, defendant Bailey argues that evidence regarding Belvedere's attempts to coerce Ursula Rumas' testimony was inadmissible against him and prejudicial to him. He also contends that he was prejudiced by the State's question to Ursula as to whether her supplier of heroin was a friend of defendants. Belvedere maintains that he was also prejudiced by this inquiry. Belvedere did not include this issue in his written motion for a new trial and thus, the issue is waived for purposes of appeal. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) Nonetheless, despite the waiver, we elect to relax the waiver rule and consider the issue. (See *People v. Brown* (1972), 52 Ill. 2d 227, 287 N.E.2d 663.) We reject these contentions.

Generally, evidence of other crimes is inadmissible in criminal cases because a jury may infer defendant's guilt from such other crimes. (*People v. Coleman* (1972), 9 Ill. App. 3d 402, 292 N.E.2d 483.) Where the testimony has no value beyond that inference, it is excluded. But where evidence is independently relevant, it is admitted as "where it shows motive or intent, identity, absence of mistake or accident, or the existence of a common scheme or design." (*People v. Lehman* (1955), 5 Ill. 2d 337, 343, 125 N.E.2d 506, 509.) In the present case, Ursula Rumas testified on direct examination that defendants met her at a lounge before trial. Belvedere told her that he "liked" her story given to the police and asked her to tell his lawyer that she had seen blood on his face. Belvedere also stated, "We should have killed them all." She further testified that even

though she did not recall seeing any blood, she admitted to Belvedere that she did and also promised to see his lawyer the next day. Later, when she and Belvedere were alone, he promised her gifts, a trip and made love to her. During Belvedere's conversation with Ursula at the bar, which consisted of promises and threats made to her, Bailey and another woman were seated at the table. Bailey never expressed disapproval of Belvedere's conduct nor did he withdraw from the group.

■■ Under these circumstances, and in view of the doctrine expressed in *People v. Lehman*, it was not improper to admit the testimony of Ursula regarding the promises and threats made by Belvedere. (See 2 Wigmore, Evidence §§304, 315, at 202-05, 217 (3d ed. 1940).) Moreover, Belvedere's attempt to coerce Ursula was admissible against Bailey. (See *People v. Murphy* (1974), 17 Ill. App. 3d 482, 308 N.E.2d 235.) We fail to perceive how Bailey was prejudiced by the introduction into evidence of Ursula's testimony because a distinction was made at trial between those statements made by Belvedere at the bar when Bailey was present and statements made later when Belvedere and Ursula were alone. The court sustained defense counsel's objection to the statements made out of Bailey's presence and gave a cautionary instruction that the jury was not to consider these statements against Bailey.

Defendants' next assertion of prejudice arises after testimony by Ursula that after her meeting with defendants, she went to a bar where she obtained heroin. She took an overdose in an attempt to kill herself. On cross-examination by counsel for Belvedere, she testified that she did not buy the heroin but that a guy named Sherman came up, offered it to her and she took it. She further testified that she did not know him by any other name and did not know him too well. On cross-examination the defense counsel then asked:

"Q. You mean, somebody you don't know well came up to you and said, hey, Ursula, here's some heroin? Is that what you are trying to tell us?"

A. Yes.

Q. Yes?

A. Well Cindy knew him."

On re-direct examination, the prosecutor inquired:

"Q. This fellow Sherman that gave you the heroin, do you know if he knows either one of the defendants?"

The defendants' objection to this question was sustained. Ursula never answered the question. During a colloquy which followed a defense motion for a mistrial, the prosecutor stated he had a factual basis for the questions but the court did not require the prosecutor to state the factual basis for the question. The court denied the motion for mistrial stating:

"If he had a factual basis and asked me for a recess and told me he had a basis, I would have let her answer. So your motion for mistrial is denied."

■ Generally, the cases hold that it is improper to ask a question which suggests an answer without being prepared to offer evidence of what was suggested by the question. In this case, the prosecutor claimed he had a factual basis for the question. The record is silent as to what the claimed factual basis was since the prosecutor did not advise the court. We think that absent a factual basis for the question it was improper for the prosecutor to ask the question. Even though we find the question incorrect, we deem it not sufficient to require the reversal of defendants' convictions. The objection to the question was promptly sustained and the question was asked only once in a lengthy trial. The prompt sustaining of a defense objection to the question cured and rendered harmless the error.

Both *People v. Telio* (1971), 1 Ill. App. 3d 526, 275 N.E.2d 222, and *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, principally relied on by defendants are distinguishable on their facts. In *Telio*, the prosecutor admitted that he had no factual basis for suggesting that a defense witness he was cross-examining was a narcotic user and in *Nuccio*, there were repeated unsupported insinuations during cross-examination.

## II

Defendants next argue that they were denied a fair trial when a former prosecutor was erroneously permitted to testify that he told a prospective witness that there were 10 witnesses who contradicted her initial statement to the police. In particular, Belvedere contends that this "hearsay reference to the evidence of 10 witnesses" by former Assistant State's Attorney John Gertie induced and intimidated the witness, Ursula Rumas, to change her testimony and the effect of Gertie's conduct was spoilation of favorable defense evidence. Likewise, Bailey joins in these assertions. Additionally, he contends that Assistant State's Attorney Gertie expressed his personal belief in defendants' guilt and that Gertie's pretrial statement was prejudicial because it suggests that a greater number of prosecution witnesses are more credible than the two defendants. We find these contentions to be without merit.

■ Our supreme court has previously held that it is not improper for a prosecuting attorney to advise prospective witnesses of the penalties for perjury, nor should those charged with the enforcement of the criminal law be precluded from expressing disbelief of a prospective witness'

contemplated testimony. (*People v. Eubank* (1970), 46 Ill. 2d 383, 263 N.E.2d 869; *People v. Flowers* (1958), 14 Ill. 2d 406, 152 N.E.2d 838.) In *Eubank*, affidavits in support of a motion for new trial revealed that the prosecutor had advised a prospective witness of the penalties for perjury and had also voiced his disbelief of the witness' contemplated testimony. The court concluded that the prosecutor's conduct was not error.

In the case at bar, Ursula, after the incident, was taken into custody by the Melrose Park police. She stated to the police that after Belvedere slapped Cindy, a fight ensued and she had seen one of the guys in the Volkswagen with a crowbar raised in the air. Ursula changed her story when she testified before the grand jury and the testimony she gave at trial supported the prosecution's theory of the case that the victims displayed no weapons. Gertie testified that no promises were made to Ursula in exchange for her testimony and the charges against her were dropped because they could not be proven. He also testified that he warned Ursula of the consequences of perjury, that 10 people had told him a different story, and that he intended to convey to her his reluctance to accept her contemplated testimony.

■■ Gertie's testimony followed Ursula's appearance as a witness and undoubtedly was for the purpose of rebutting the inference that Ursula testified against defendants in exchange for having criminal charges against her dismissed. He did not express his personal belief in defendants' guilt. We do not believe that testimony concerning statements by the prosecutor that he did not accept Ursula's version of the facts and his advice to her of the penalty for perjury constituted error. In view of the overwhelming evidence of guilt disclosed by the record, this testimony had no prejudicial effect on the trial of this case.

■■ Moreover, we think that Gertie's interview with Ursula did not intimidate her into testifying favorably for the prosecution and did not constitute spoilation of favorable defense evidence. We have examined the authorities cited by defendants in their briefs and find no case analogous on its facts to this case. Thus, Belvedere's emphasis on *Webb v. Texas* (1972), 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351, is not controlling. In *Webb* the Supreme Court found that the trial court's threatening remarks to a witness to the effect that he could be prosecuted for perjury if he gave false testimony caused that witness to be driven from the stand and thus deprived defendant of due process of law under the fourteenth amendment. In the present case, Gertie testified that he did not tell Ursula what other witnesses had said but told her that their stories were different from hers. Consequently, his statement was not hearsay but was a metaphor used to express his disbelief in her statement.

At the conclusion of Gertie's testimony, the trial judge denied Bailey's

motion to strike all of Gertie's testimony. We cannot say that the denial of this motion was erroneous.

## III

Bailey contends that his prior conviction of the Federal offense of unlawful distribution of narcotics was improperly used to impeach his credibility, since its probative value was greatly outweighed by its prejudice. This argument is not persuasive.

■■ The decision on whether to admit evidence of prior convictions to be used to impeach a witness is a matter of judicial determination and is governed by the rules set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. There, the supreme court directed that Rule 609 of the then-proposed Federal Evidence Rules be followed in future cases. The approved draft of Rule 609 provided in part:

" '(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime, except on a plea of *nolo contendere*, is admissible but only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice.

'(b) Time Limit. Evidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date." 47 Ill. 2d 510, 516.

The Advisory Committee's comments to this rule includes the following:

" 'The most significant feature of the rule is the requirement that the evidence of conviction be excluded if the judge determines that its probative value is outweighed by the danger of unfair prejudice. * * *' " (47 Ill. 2d 510, 517.)

In addition, the comments cited a number of factors to consider when a court weighs the probative and prejudicial values of the prior convictions. The factors as suggested by *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936, *cert. denied* (1968), 390 U.S. 1029, 20 L. Ed. 2d 287, 88 S. Ct. 1421, and *People v. Dee* (1975), 26 Ill. App. 3d 691, 325 N.E.2d 336, are: (1) the nature of the prior crimes; (2) the length of defendant's criminal record; (3) the age and circumstances of defendant; (4) the likelihood that defendant would not testify if his motion to exclude his prior convictions was denied; (5) the nearness or remoteness of the prior convictions; (6)

the defendant's subsequent career; and (7) whether the prior crime was similar to the one charged.

Specifically, Bailey contends that the prior conviction had no relevance to the question of his credibility and does not reflect adversely on his veracity.

Bailey's prior Federal conviction for unlawful distribution of narcotics was a felony as a violation of section 4704(a) of the Internal Revenue Code (26 U.S.C. §4704(a) (1964)). The punishment for that narcotic offense was prescribed by section 7237 which provided for imprisonment of not less than two years nor more than 10 years and the possibility of a fine of $20,000. Thus, the trial court was required only to determine whether the probative value of the admission into evidence of the conviction was "substantially outweighed by the danger of unfair prejudice."

In applying the factors set forth in *Montgomery* and *Dee*, we find that a number of these factors point to the probative value of Bailey's prior conviction. Concerning the nature of the crime, we observe that convictions for possession of a controlled substance have previously been held to be probative of credibility. In *People v. Nelson* (1975), 31 Ill. App. 3d 934, 335 N.E.2d 79, the court examined the issue of whether possession of controlled substances is probative of a witness' credibility and held:

> "The offense of possession of heroin does indicate a disposition to place the advancement of individual self-interest ahead of principle or the interest of society, and such proof may suggest a willingness to do so again on the witness stand. (*People v. Duffy*, 36 N.Y.2d 258, 326 N.E.2d 804 (1975).) * * * We believe that the defendant's prior conviction does reflect adversely on his honesty and integrity." (31 Ill. App. 3d 934, 938, 335 N.E.2d 79, 83. See also *United States v. Davis* (9th Cir. 1974), 501 F.2d 1344; *United States v. Rucker* (8th Cir. 1974), 496 F.2d 1241; *People v. Sawyer* (1971), 48 Ill. 2d 127, 268 N.E.2d 689.)

It would appear that unlawful distribution of narcotics should equally reflect adversely on Bailey's credibility.

In regard to the other factors mentioned in *Montgomery* and *Dee*, it would appear, as the court found in *Nelson*, that a narcotic offense has a bearing on credibility and was not an instance of criminal conduct which might have caused unfair prejudice; that youth does not mitigate in his favor, as Bailey was approximately 22 years old when convicted of unlawful distribution of narcotics; that Bailey testified in the trial and therefore did not feel compelled not to testify because of anticipation that the prior conviction would be brought to the jurors' attention; that the Federal narcotic conviction occurred in 1970, within five years of the trial

of the instant case; and that the offenses charged in the pending case—murder, attempt murder and aggravated battery—were not so similar to unlawful distribution of narcotics as to be unfairly prejudicial.

We also feel that a review of the record discloses that Bailey's additional assertions, that unfair prejudice resulted to him because the prosecutor did not use the prior conviction for the limited purpose of attacking credibility but as character assassination of both defendants and that during the course of the trial the prosecutor attempted to connect both defendants to the narcotics underworld and thereby to Ursula's attempt to kill herself by overdosing on narcotics, are untenable.

Bailey attempts to avoid application of the holding in *People v. Nelson*, that a narcotic offense may have a bearing on testimonial credibility, by arguing that admission of the prior narcotic conviction there was allowed because Nelson testified in some detail about the prior offense. Actually, Nelson testified to the circumstances regarding his years of addiction; he did not testify in detail to the prior offense of possession. Moreover, the court mentioned that possession of heroin was not synonymous with drug addiction. Thus the facts in *Nelson* are analogous to those in the pending case where no particular facts about Bailey's prior conviction were presented to the trial judge.

Bailey also maintains that his plea of guilty to the narcotics charge further reduced the relevance of that conviction. We feel that a prior narcotics conviction would afford a basis for impeaching his credibility, regardless of whether the conviction is the consequence of a guilty plea or trial.

Further, we see no merit in Bailey's argument that *People v. Ridley* (1975), 25 Ill. App. 3d 596, 323 N.E.2d 577, is supportive of his position. In *Ridley*, defendant was charged with armed robbery. The trial court denied defendant's pretrial motion to bar the use of his January 1971 armed robbery conviction to impeach him at his armed robbery trial in September of 1972. He was found guilty and on appeal contended that since the 1971 conviction was a result of a guilty plea, its probative value was weakened. He cited a footnote in *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936, 940 n. 8, where the court did point out that the relevance of prior convictions "may well be different" as between a plea and a trial where the defendant puts his own veracity in issue when he testified so that the jury's verdict amounted to a rejection of his testimony; the verdict is in a sense "a *de facto* finding that the accused did not tell the truth when sworn to do so." This court in affirming the trial judge's denial of the motion to bar the prior convictions stated:

> "But rather than barring a conviction based on a plea, it would seem sufficient if the accused could, as the *Gordon* court did, argue that a guilty plea, as such, does not affect credibility, *i.e.*, be

allowed to show that the conviction was by a plea, and that when he was in fact guilty, the defendant admitted it." (25 Ill. App. 3d 596, 602, 323 N.E.2d 577, 581.)

The thrust of the *Ridley* decision, therefore, is to establish a rule that defendant could argue only that his guilty plea, as such, did not affect his credibility. Nevertheless, his conviction did affect his credibility and was admissible.

In the present case, Bailey testified on surrebuttal that he pleaded guilty to the narcotic charge because he was guilty. On cross-examination, the prosecutor asked Bailey whether the prior plea was tendered because he could not "beat that charge." Defense counsel objected to the question and the court immediately sustained the objection. Bailey claims that the question was improper and prejudicial. Even if the question could be construed as improper, it was a single inquiry, was not repeated, and did not serve to prejudice Bailey in the eyes of the jury. Moreover, defense counsels' inquiries and Bailey's answers were intended to establish that Bailey pleaded guilty when he was guilty, and since he told the truth and admitted his guilt at a prior time, he was more likely to be telling the truth in the case on trial. Defense counsel argued this theory in closing argument stating: (1) that in a criminal case you can plead guilty; (2) that if you are guilty that is the thing to do; and (3) Bailey pleaded guilty in the prior case, but did not plead guilty in this case. Pursuant to *Ridley*, he was only entitled to argue that the guilty plea, as such, did not affect credibility. Nevertheless, his argument attempted to persuade the jury that he was innocent of the charges because of his prior guilty plea.

## IV

■■ Defendants also complain that certain comments of the prosecution to the jury during closing argument were so prejudicial as to have deprived them of a fair trial. Initially we point out, and Belvedere admits, that he did not include this contention in his written motion for new trial. He urges, however, that these comments are nonetheless reviewable under the "plain error rule" in Supreme Court Rule 615(a). (Ill. Rev. Stat. 1973, ch. 110A, par. 615(a).) We find no plain error on the record that this court should take notice of pursuant to Supreme Court Rule 615(a). However, courts have often relaxed the waiver rule on the basis of fundamental fairness. (*People v. Brown* (1972), 52 Ill. 2d 227, 287 N.E.2d 663; *People v. Roberts* (1978), 56 Ill. App. 3d 667, 372 N.E.2d 143.) We will consider Belvedere's contentions on this basis.

■■ Belvedere first directs our attention to the following statements of the prosecutor:

"That's why they wanted to keep them at the scene. They want to whop them with a voluntary manslaughter and if you ladies and

gentlemen find them guilty of voluntary manslaughter, you are telling those two gentlemen that we believed everything you told us because what they told you ladies and gentlemen is a judicial confession to voluntary manslaughter.

\* \* \*

Mr. Pappas: They want you to convict them of voluntary manslaughter.

\* \* \*

Mr. Pappas: Based on their testimony, ladies and gentlemen, they want you to convict them of voluntary manslaughter and that is a cop-out."

Later in his argument the prosecutor again commented:

"Ladies and gentlemen, don't cop-out. You know deep down, you know it is murder. You find them anything less than guilty of murder, attempt murder of Beuchner, attempt murder on Sigle, a cop-out if you do that. You are telling Mark Butterly, Pat Angelo, John Beuchner, John Sigle that we don't believe you."

He argues that these comments were improper because a prosecutor is prohibited from expressing his personal opinion as to the guilt or innocence of the accused. Specifically, he maintains that the argument that defendants wanted the jury to find them guilty of the lesser included offense of voluntary manslaughter, was the expression of a personal opinion by the prosecutor. We cannot agree. The remarks concerned the credibility of the defendants, the prosecutor's requests that the jury accept the version of the facts offered by the State's witnesses, return a verdict of murder and reject the manslaughter theory offered by defense counsel in closing argument. These are proper subjects of comment by the prosecutor. See *People v. Gerecke* (1977), 45 Ill. App. 3d 510, 359 N.E.2d 1178.

■■ Belvedere argues that he was prejudiced by the prosecutor's reference to defendants' testimony as a "judicial confession to voluntary manslaughter." Although use of the word "confession" was ill-advised, we hold this to be harmless in view of the competent evidence of defendants' guilt.

■■ Belvedere also asserts that he was prejudiced by use of the words "cop-out." The prosecutor urged the jury not to "cop-out" and also stated that based on defendants' testimony they wanted the jury to convict them of voluntary manslaughter and that is a "cop-out." We believe that the expression "cop-out" was used by the prosecutor to urge the jury to effectively enforce the law by not allowing defendants to evade the consequences of their acts. See *People v. Pugh* (1951), 409 Ill. 584, 100 N.E.2d 909; *People v. Ramey* (1974), 22 Ill. App. 3d 916, 317 N.E.2d 143.

*People v. Young* (1975), 33 Ill. App. 3d 443, 337 N.E.2d 40, cited by

Belvedere, does not support his position that the prosecutor's argument amounted to an expression of the prosecutor's personal opinion that defendants were guilty of murder because the argument made in *Young* is distinguishable from the argument in the pending case. In *Young,* the prosecutor stated:

> " 'You might say, well, the evidence is so overwhelming, what's the defendant doing in court? Why hasn't it been negotiated out? Well, ladies and gentlemen, he has got a right to a trial, number 1, number 2 when you get 12 people in a jury box you never know what's going to happen and I will be the first one to admit it, I have tried a lot of jury cases. So some people decide they will take a chance, roll the dice. Different people do things different ways.' "
> (33 Ill. App. 3d 443, 446-47, 337 N.E.2d 40, 43.)

This court held that the prosecutor's remarks offered the jury a motive other than defendant's innocence for his election to proceed to trial instead of pleading guilty and that this constituted reversible error since the import of offering that motive was to express the prosecutor's personal opinion of defendant's guilt. In the case at bar, the prosecutor only called for zealous law enforcement when he used the term "cop-out."

Bailey attacks the prosecutor's initial closing argument to the jury in which it was stated that defendant Belvedere's car went back and forth approximately "nine times" and "maybe more" as a deliberate misstatement of the evidence and reversible error. We observe that no objection was made during closing argument that the prosecutor misstated the evidence. Bailey, therefore, has waived this point for review. Nevertheless, we feel that the interests of justice require that we address the issue on its merits. John Beuchner testified that Belvedere's car went back and forth seven times before it hit him and decedent. After striking them, the car made an eighth pass at them and then made a ninth pass forward out of the parking lot. We therefore conclude that the prosecutor's description of the movements of Belvedere's car was substantially accurate and cannot be perceived as a deliberate misstatement.

■■ ■ Bailey urges that when the prosecutor referred to defendants as "two cowards," it constituted an impermissible attack on character. We reject this contention. Generally, Illinois cases allow a prosecutor to call a witness "false" during closing arguments if this conclusion is based on the evidence or reasonable inferences drawn from it. (*People v. Owens* (1977), 46 Ill. App. 3d 978, 994, 361 N.E.2d 644, 656. See also *People v. Castillo* (1970), 130 Ill. App. 2d 387, 264 N.E.2d 516.) A prosecutor may even refer to a witness as a "liar" if there exists evidentiary support for that characterization. (*People v. Ross* (1978), 60 Ill. App. 3d 857, 864, 377 N.E.2d 230, 236.) In the present case, we do not condone the reference to

defendants as "cowards," but we believe the remark to be harmless error.

■■ Even though no objection was made to the following statement by the prosecutor regarding Ursula Rumas, "we don't pick our witnesses like Belvedere picks their [sic] friends," and the point is waived, we nevertheless, will respond to it. Bailey argues that the comment was an erroneous attack on the character of defendants. We find that the remark was not improper. It would appear from an examination of the closing argument that the prosecutor was explaining to the jury that although Belvedere might have chosen to have a social relationship with Ursula, the State had to accept their witnesses as they found them without regard to whether they were of desirable character.

■■ Bailey asserts that it was prejudicial for the prosecutor to invite the jury to dwell on the gory photographs of the decedent. Specifically, Bailey complains that it was not necessary during closing argument to hold up the photographs to the jury in order to recall the testimony of Dr. Stein, who had testified as to how decedent's wounds were caused. Again, no objection was voiced to this portion of the closing argument and the point, therefore, is waived. However, we elect to consider it. The photographs of decedent were admitted into evidence at the close of the State's case-in-chief. Even Bailey concedes in his brief that the photographs had probative value in depicting the nature and extent of the injuries inflicted upon decedent. We cannot say that displaying the photographs to the jury by holding them up while the prosecutor recounted Dr. Stein's testimony was error since the photographs were necessary to Dr. Stein's explanation regarding decedent's wounds.

■■ Bailey argues that in recounting Ursula Rumas' testimony, the prosecutor described her as "a woman who has been cooperating with the State's Attorney's office and telling the truth." He posits that this remark improperly expressed his personal belief in the witness' veracity and that this statement was so similar to the statement made by the prosecutor in *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256, that we should reverse the conviction. We think not. In *Bitakis* the following statement made by the prosecutor during closing argument was held to be reversible error:

> " 'Mrs. Perry and what she told the police was no where [sic] in the police report. I am not ready to jeopardize my reputation by putting a false witness on that stand. If I thought the Lalagos family put her up to testifying she would not have hit that stand because it is not worth it to me. Especially she would not have been able to stand up on cross-examination and you would have seen that she was there to perjure herself and you would have disregarded her testimony and you would, therefore, had [sic] disregarded our

entire case and found him not guilty.' " (8 Ill. App. 3d 103, 106, 289 N.E.2d 256, 258.)

This court found the remarks in *Bitakis* to be improper, because the prosecutor argued that his reputation guaranteed the truthfulness of the State's witness or he would not have called her. In the pending case, there is no indication that the prosecutor attempted to bolster the credibility of Ursula Rumas in this manner.

■■ Bailey maintains that the prosecutor in his argument incorrectly shifted the burden of proof to defendants by commenting on their failure to call certain witnesses. Bailey correctly points out that it is improper to make comments which shift the burden of proof to defendants, who are presumed innocent and bear no burden of proof. (See *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.) Nevertheless, when defense counsel invites or provokes a response by the prosecutor he cannot complain that he has been prejudiced by the response. (*People v. Coleman* (1977), 51 Ill. App. 3d 499, 366 N.E.2d 1026.) In this case, defense counsel attacked the prosecutor for his failure to call any one of decedent's three companions to testify that they never heard the word "gun." The prosecutor responded by stating that defense counsel failed to take advantage of the opportunity to ask them that question during cross-examination of each witness. Later, defense counsel observed that the prosecution did not call William Parker, the second grill man at the Hasty Grill that morning. The prosecutor then properly replied to the comment by stating that the defense could have called Parker if they had so desired. Where defense counsel attacks the prosecutor for his failure to call certain witnesses, it is proper for the prosecutor to respond and to ask why defense counsel did not bring in the same witnesses, so long as the response is properly limited to a reply. *People v. Wheeler* (1955), 5 Ill. 2d 474, 126 N.E.2d 228.

Bailey contends that it was error for the prosecutor during closing argument to refer to his prior conviction with the following comment:

> "He pleaded guilty in 1971, ladies and gentlemen, that was a different case. It was not a murder case. He cut a deal then. Don't let him cut a deal now."

He urges that this argument with reference to his prior conviction was prejudicial in that the inference that Bailey "cut a deal" was not supported by the evidence. Although there is nothing in the record that indicates that Bailey "cut a deal" in regard to the prior charge, the single comment was an isolated reference and could not have influenced the jury's verdict. Defense counsel argued to the jury that the former plea of guilty implied the innocence of his client to the pending charge. This invited the prosecutor's response that Bailey not be allowed to "cut a deal" in the

present case. The prosecutor's reply pointed out the defense strategy which had the goal of evading or lessening the consequences of Bailey's acts.

■■ Bailey attacks the prosecutor's argument as being improper when he referred to both defendants in arguing the facts regarding the charge made solely against co-defendant Belvedere of attempted murder of John Beuchner. Bailey was not charged with the attempted murder of Beuchner. Bailey was, however, in the car that ran over Beuchner. The prosecutor did mention both defendants when he argued intent to kill Beuchner. We point out that the jury was instructed to give separate consideration to the case against each defendant and decide the case on the basis of the evidence limited to each defendant. We therefore conclude that no prejudicial error resulted to Bailey because any error that may have occurred was cured and rendered harmless by the court's instruction to the jury.

■■ Bailey contends, as did Belvedere, that he was prejudiced by the prosecutor's argument that the motive for his decision to stand trial and testify was to persuade the jury to convict him of voluntary manslaughter and that was a "cop-out." Bailey argues that this offered the jury a motive other than defendant's innocence for his election to proceed to trial instead of pleading guilty. As in Belvedere's case, we find this contention to be without merit. Dispositive of this argument is *People v. Ramey* (1974), 22 Ill. App. 3d 916, 317 N.E.2d 143, where the prosecutor stated in argument that the defense strategy was to "cop-out" on a lesser included offense of theft. This court, in referring to the prosecutor's remark, indicated that in its view, the phrase "cop-out" did not mean "cop a plea," but is more equivalent to the idea of evading or lessening the consequences of defendants' acts. In this case, Bailey's argument at trial was a defense strategy having the goal of evading or lessening the consequences of his acts. Consequently, the prosecutor's comment was a proper reply to Bailey's argument.

Bailey also asserts that the prosecutor's remarks concerning decedent's and his companions' motives for interfering in the argument between co-defendant Belvedere and Cynthia Saccomanno were prejudicial. A review of the prosecutor's comments on this point, however, particularly those portions of it cited and quoted in Bailey's appellate brief, indicates that Bailey's contention is generally incorrect. We do not find in these remarks an improper emphasis on the character of the victims. There was overwhelming evidence that Bailey struck and beat Cynthia. Although the defense argument suggested that the beating of decedent and the attack upon Sigle and Beuchner were separated from the first encounter with defendants, ample facts existed from which

inferences could be drawn that the beatings and killing happened as a result of the victims' initial attempt to prevent the attack on Cynthia. The other statements complained of by Bailey pertain to the prosecutor mentioning the evil results of crime and urging fearless administration of the law. We conclude that no prejudice resulted from these remarks.

The mere occurrence of improper remarks does not of itself mandate reversal. (*People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied* (1975), 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786.) In order to warrant reversal, it must be shown that the remarks resulted in substantial prejudice, constituted a material factor in the conviction or that the judgment would have been different had the improper comments not been made. (*People v. Coleman* (1977), 51 Ill. App. 3d 499, 366 N.E.2d 1026; *People v. Lewis* (1976), 38 Ill. App. 3d 995, 349 N.E.2d 528; *People v. Trice* (1970), 127 Ill. App. 2d 310, 262 N.E.2d 276.) We believe that the comments of the prosecutor were not a significant factor in the jury's determination. To conclude otherwise would require us to disregard overwhelming evidence of defendants' guilt adduced by the prosecution.

## V

Defendants' final contention is that the sentences imposed by the trial court are excessive. Bailey and Belvedere received sentences of 75 to 200 years for murder, 25 to 50 years for attempt murder of John Sigle and 3 to 10 years for aggravated battery of John Sigle. Additionally, Belvedere received a sentence of 25 to 50 years for attempt murder of John Beuchner. The sentences are concurrent.

Supreme Court Rule 615(b)(4) (Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(4)), grants reviewing courts the power to reduce sentences. The Illinois Supreme Court, however, has mandated that a reviewing court should not alter a sentence absent an abuse of discretion by the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In *People v. Jovicevic* (1978), 63 Ill. App. 3d 106, 379 N.E.2d 665, this court held that it was not its function to serve as a sentencing court and substitute its judgment for that of the trial court merely because it may have imposed a different sentence. In considering whether the trial court abused its discretion in imposing sentence, we observe that the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, §11.

Under the facts and circumstances of the present case, we cannot say that the trial court abused its discretion in its determination of sentence. The evidence indicates that both defendants, armed with a jack

and jack handle, were active participants in a brutal attack upon Mark Butterly and that this attack resulted in Butterly's death. Initially, Belvedere, with Bailey as a passenger, rammed his car into decedent and Beuchner. Shortly thereafter, defendants made their savage attacks on decedent and Sigle.

Bailey's conduct, even though he was not charged with or convicted of the attempt murder of Beuchner, was not less culpable than that of Belvedere. He was sentenced only for the crimes of which he was convicted: the murder of Butterly, attempt murder of Sigle and aggravated battery of Sigle. He and Belvedere both attacked the Volkswagen in which Sigle and decedent were seated and then both ferociously beat decedent to death. Furthermore, Bailey had a prior conviction for unlawful distribution of narcotics.

Bailey asserts that the court did not take into account evidence of his intoxication. This contention is without merit. The record does not reveal the failure of the trial court to consider the fact that Bailey had been drinking prior to the murder of decedent and the attempt murder and aggravated battery of Sigle.

Defendants further argue that their prior criminal records are relatively minor. Additionally, Bailey maintains that the trial court failed to take into account his potential for rehabilitation in sentencing him. A review of the record shows that defendants' contentions are unfounded because the trial court carefully examined the presentence reports of both defendants. This case reveals no abuse of the trial court's discretion. Accordingly, defendants' convictions and sentences are affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.