THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EUGENE
RIDLEY, Defendant-Appellant.

(No. 59104;

First District (1st Division)—January 20, 1975.

Paul Bradley and Brenda E. Richey, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Jerome Charles Randolph, Assistant State's Attorneys, of counsel), for the People.

PER CURIAM:

The defendant, Eugene Ridley, was indicted, along with Paul Roebuck and L. C. Woodard, for the May 23, 1972, armed robbery of Peter Popik. (Ill. Rev. Stat. 1971, ch. 38, par. 18—2.) Woodard was tried separately. Ridley and Roebuck were tried together and convicted following a jury trial. Ridley was sentenced to not less than 20 nor more than 40 years. On appeal, Ridley contends: (1) the court should have granted his motion at trial for severance or for a mistrial because of the disruptive behavior of his codefendant, Roebuck; (2) under *People v. Montgomery*, 47 Ill.2d 510, 268 N.E.2d 695, the court should have granted defendant's pretrial motion to bar the use of his two January, 1971, armed robbery convictions to impeach him at this armed robbery trial in September of 1972; (3) the defendant was denied his right to a fair trial when the State's Attorney stated his personal opinion of defendant's guilt during closing argument; and (4) the sentence is excessive in light of the defendant's age at trial (21) and since no violent acts occurred during the commission of the armed robbery.

At trial, on September 14, 1972, Peter Popik testified that he is a part owner, along with Raymond Hadac, of the Certified Food and Liquor Store, 1906 West 69th Street in Chicago. On May 23, 1972, at about 4 in the afternoon, he was with Hadac in an office overlooking the cash registers which are located just inside the door, when, through a one-way mirror glass he saw the defendants Ridley and Roebuck and a third man, one L. C. Woodard, enter the store and stand for a while near the check-

out area near the cash registers and the carts. He then went downstairs to the courtesy booth which is located on a line with the cash registers. The men were dressed in coats, two wore hats, and Ridley wore a black glove on his right hand, an unusual manner of dress since the temperature that day was in the eighties. Ridley came to the courtesy booth and asked to cash a check. When he asked Ridley if he was registered at the store, Ridley said he was not, but that his friend was and motioned for Roebuck to come over. Ridley then pulled out a gun and placed it inside the courtesy booth window and told Popik to give him all the money he had and put it in the bag. He took all the money out of the drawer and laid it on the counter in front of him, telling Ridley he didn't have a bag; Ridley put some of the money in his pocket and Roebuck got a paper bag and Ridley and Roebuck then took money from the cash registers and put it in the bag. Ridley returned to the courtesy booth and the two left the store together. Since, as indicated, the courtesy booth is in line with the cash registers, Popik was able to take photographs of the robbery in progress with a wedge-scope check-cashing camera that viewed a line of 3 cash registers from a side view. Exhibits 2 through 12 in evidence are photographs he took, and they show Ridley clearly in one picture close to the courtesy booth; other pictures show two men taking money from the cash registers. The photographs also show store employees (cashiers) and customers, including a young boy, who were in the store at the time. Popik also identified as an exhibit a weapon that "looked like" the weapon pointed at him by Ridley. About 6:15 that evening he identified the three men from a six-man line-up, a photograph of which was also introduced into evidence.

Michael Danowski testified that he is the produce manager of the store and was working in the back of the store when he received a call from Ray Hadac. He then went to the front of the store and saw Roebuck and Ridley, whom he identified in court, and Woodard, who then left the store. Danowski followed out the side door of the store into the parking lot where he saw Woodard get into a 1970 green Chevrolet with a black vinyl top parked nearby on Winchester, right by the driveway. He then returned to the store and saw Roebuck and Ridley taking money from the cash register and phoned the police. When they left the store, he returned to the parking lot and saw them get into the green Chevrolet Woodard was driving and drive off. Ridley pointed the gun at him when he saw him in the parking lot. When the police arrived Danowski gave them a description of the green Chevrolet, including the fact that the first two letters of the license plate were "HP." He later identified the defendants from the same six-man line-up shown in the photographic exhibit.

Raymond Hadac, the co-owner, testified that he was with Popik in the office behind the courtesy booth and saw Ridley, Roebuck and a third man enter the store, saw Popik take some money downstairs with which to cash checks, and watched the entire robbery through the one-way mirror. He tripped the alarm when he saw Ridley pull the gun at the courtesy booth and he also identified Ridley and Roebuck from the line-up shown in the photographic exhibit.

Chicago Police Officer Gerald McGovern testified that he answered the robbery call, and spoke to Danowski who gave him the description of the 1970 green Chevrolet with the license plate beginning with "HP" occupied by three male Negroes, and he broadcast this information over the police radio.

Chicago Police Officer Dale Riordan testified that he received a radio message at 4:05 P.M. and observed the vehicle fitting the broadcast description headed northbound on Paulina and caught up with it at 58th and Marshfield. As he approached in his marked blue-and-white police vehicle, the wanted vehicle accelerated at a high rate of speed. He turned on the spotlight and the siren and unsuccessfully tried to curb the vehicle. He oberved a number of objects thrown from the vehicle at 58th and Marshfield, what appeared to be a chrome-plated revolver, what appeared to be another revolver, and a third object he could not identify. He stopped the vehicle at 55th and Halsted and arrested the defendants, whom he identified in court, and Woodard, who was driving. He later recovered, at 57th and Elizabeth, the weapon which Popik had earlier identified as looking like the weapon pointed at him by Ridley. A search of Roebuck at the station resulted in $191 in tens, fives, and 52 singles and a search of Ridley resulted in $132, 2 tens, 12 fives, and 52 singles. Woodard had $27 on his person. The inventory slip for the weapon contained a notation that it was recovered from Ridley because he saw the person in the front-seat passenger-side of the car throw it, and when he stopped the car, Ridley was sitting in the front-seat passenger-side of the car.

Defendant's first contention is that Roebuck's behavior in front of the jury denied him a fair trial. The record shows that on September 11, 1972, Roebuck, in order to protect his rights under the Four Term Act, asked for an immediate trial, but also asked for a lawyer other than the public defender. On both September 11, and September 12, 1972, his request was refused because the term would have expired before a "bar lawyer" could be obtained. Questions about Roebuck's mental competency were also raised at various points during the trial by Roebuck's lawyer. It was not until one panel of jurors had been chosen that Roebuck began to speak out in the presence of the jury. At this point the judge immediately ex-

cused the jury. Roebuck's complaints were that his lawyer, an assistant public defender, was not truly representing him, that he was being forced to trial without a lawyer, that black people were being kept off the jury and that the judge was "racist." Each occasion when Roebuck spoke out, the court took immediate action to separate the defendant and the jury. Motions by Ridley for severance and a mistrial were denied, and members of the venire were questioned both about whether Roebuck's outburst would affect their ability to give Roebuck or Ridley a fair trial. One juror was excused because she said she thought she might not possibly be able to give Roebuck a fair trial. The court had a conference in chambers following the first outburst and warned Roebuck that he would be removed if he continued. Roebuck was removed from the courtroom on the next occasion and told that he would not be allowed to return unless he would "behave" himself. The result was that Roebuck was not present for the trial except for very brief periods when he entered court to be identified by the witnesses Popik, Hadac and Officer Riordan. On these occasions Roebuck did make brief derogatory comments to the judge or to the witness, but the court immediately admonished the jury that they were not to consider any statements made by Roebuck off the witness stand.

■■ *People v. Washington,* 77 Ill.App.2d 8, 222 N.E.2d 150, cited by the defendant, is distinguishable. In remanding for a new trial, the court there noted that on 119 occasions the codefendant Allen had interrupted the trial with "ravings and abusive epithets directed at the judge, the State's Attorney, and even at his own counsel," and that removal of the defendant was among the measures a trial judge might take to preserve decorum. (77 Ill.App.2d 8, 9, 13.) In the case at bar, the trial judge took the appropriate and immediate action necessary to insure decorum and to minimize any possible prejudice to the defendant Ridley. He excluded Roebuck from nearly all of the trial proceedings when it became evident that Roebuck's intention was to disrupt the proceedings. Yet, when it was necessary, Roebuck was brought into the courtroom to be identified by the key witnesses. When, on these occasions, Roebuck made outbursts, the judge was careful on each occasion to instruct the jury to disregard these comments by Roebuck. As the court recently pointed in *People v. DeSavieu,* 14 Ill.App.3d 912, 919, 303 N.E.2d 782, if such conduct by a codefendant were held to require a retrial, it might never be possible to try more than one defendant at a time, and disruptive behavior would thereby become a device by which defendants might easily provoke a mistrial whenever it might suit them. The court properly denied the defendant's motion for severance and mistrial.

■■■ Defendant next contends that the court erred in denying defendant's pretrial motion to bar use of his 1971 armed robbery conviction at this 1972 armed robbery trial, under the rule announced by the Illinois Supreme Court in *People v. Montgomery*, 47 Ill.2d 510, 517-518, 268 N.E.2d 695, that it is within the sound discretion of the trial court to refuse to allow a defendant to be impeached by a prior criminal conviction if the trial judge believes the prejudicial effect of impeachment outweighs the probative relevance of the prior conviction to the issue of credibility. Citing *Gordon v. United States* (D.C. Cir. 1967), 383 F.2d 936, the Illinois Supreme Court noted the various factors the *Gordon* court had suggested be considered in making the determination: "[T]he nature of the crime, nearness or remoteness, the subsequent career of the person, and whether the crime was similar to the one charged." (47 Ill.2d 510, 518.) It is the latter problem with which we are concerned here, for as defendant points out, one of the most difficult problems involving the use of a prior conviction is the situation now before us where a criminal defendant is impeached by a proof of a recent prior conviction of the same crime with which he is charged. *Gordon* pointed out the tendency of a lay jury to reason: "If he did it before, he probably did it this time." Impeachment by conviction for the same crime, the *Gordon* court said, should be used "sparingly; one solution might well be that discretion be exercised to limit the impeachment by way of a similar crime to a single conviction and then only when the circumstances indicate strong reasons for disclosure, and where the conviction directly relates to veracity." 383 F.2d 936, 940.

In this case, the prior conviction did relate to veracity. The court said in *Gordon* (383 F.2d 936, 940):

> "In common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a man's honesty and integrity. Acts of violence on the other hand, which may result from a short temper, a combative nature, extreme provocation, or other causes, generally have little or no direct bearing on honesty and veracity. A 'rule of thumb' thus should be that convictions which rest on dishonest conduct relate to credibility whereas those of violent or assaultive crimes generally do not;  *  *  *."

Obviously, robbery is a crime which, like stealing, relates directly to credibility. Although robbery involves violence, it is violence employed to a dishonest end, that is, stealing by violent means.

Defendant also contends that since his 1971 conviction was the result of a guilty plea, its probative value for impeachment purposes is thereby

weakened. He cites a footnote in *Gordon* (383 F.2d 936, 940, footnote 8), where the court did point out that the relevance of prior convictions "may well be different" as between a plea and a trial where "the accused affirmatively puts his own veracity in issue when he testified so that the jury's verdict amounted to rejection of his testimony; the verdict is in a sense a de facto finding that the accused did not tell the truth when sworn to do so." But rather than barring a conviction based on a plea, it would seem sufficient if the accused could, as the *Gordon* court did, argue that a guilty plea, as such, does not affect credibility, *i.e.*, be allowed to show that the conviction was by a plea, and that when he was in fact guilty, the defendant admitted it. In this case, the defendant's position is weakened by the fact that his lawyer chose not to argue the motion and did not ask for any limiting orders. In fact, the defendant did not inform the trial court that the 1971 conviction was the result of a plea of guilty, a fact not known until it was presented by the State at the hearing in aggravation and mitigation.

■■ Under *Montgomery*, the court is given broad discretion and under the circumstances of this case, no abuse of that discretion has been shown. Impeachment by proof of the same or similar conduct has been upheld. See *People v. Blythe*, 17 Ill.App.3d 768, 769-771, 308 N.E.2d 675 (defendant on trial for murder impeached by prior Tennessee convictions of manslaughter and assault with intent to commit robbery); *People v. Dailey*, 15 Ill.App.3d 214, 304 N.E.2d 156 (burglary defendant impeached by previous burglary conviction). *Cf.* also *People v. Bracy*, 14 Ill.App.3d 495, 503-4, 302 N.E.2d 747 (armed robbery defendant impeached by 1964 and 1965 armed robbery convictions at 1970, pre-*Montgomery* trial, dicta that *Montgomery* is "clearly distinguishable").

Defendant next contends that the following remark by the State's Attorney about half way through his closing argument, constitutes reversible error:

> "After they cleaned out the tills, another interesting thing occurred. Mr. Ridley, as if he had not already done enough, goes around the store waving a gun around and Mr. Roebuck goes over and stands by the courtesy counter and what happens then, ladies and gentlemen, *never in a courtroom has there been better evidence than this*." (Emphasis added.)

■■ Both defense counsel objected to the remark, the objection was immediately sustained, the comment was stricken and the judge instructed the jury to disregard it, stating, "Let's try this case." Defendant argues that the remark constitutes reversible error because the prosecutor impermissibly stated his own personal opinion of the evidence. Even if the remark could be so construed, it was an isolated one, it was not repeated

and it was not part of any pattern of argument in which the prosecutor stated his personal belief in the defendant's guilt. The error, if any, was not prejudicial, especially in view of the strong evidence of the defendant's guilt. *People v. Nicholls,* 42 Ill.2d 91, 100, 245 N.E.2d 771, *cert. denied,* 396 U.S. 1016.

Finally, the defendant contends the sentence was excessive in view of his age and the nature of the offense. The defendant was only 21 years of age at the time of the trial and he argues that there was no evidence that either he or his codefendants "committed any acts of violence during the robbery." But the record shows that Ridley was armed and that he assaulted Popik with the weapon, that he waved the weapon around the store when other store employees and customers were present, that he again pointed the gun in the direction of Danowski in the parking lot as he fled, and that the gun was loaded. The fact that no one was actually shot or otherwise injured during the armed robbery is not therefore, attributable to the defendant, and is not properly a factor to be considered in mitigation.

■■ The defendant was convicted of theft in 1969 and served 9 months for that offense. He was again convicted of two armed robberies in 1971 and had been out of jail less than 6 weeks when this crime was committed on May 23, 1972. Because of the superior opportunity of the trial judge to observe the defendant at trial, the discretion of the appellate court to reduce a sentence under Supreme Court Rule 615(b)(4) is to be exercised with considerable caution; and we have concluded that the circumstances in the case at bar do not justify its exercise. (*People v. Taylor,* 33 Ill.2d 417, 424, 211 N.E.2d 673.) Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.