THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
MARZELL SPURLARK, Defendant-Appellant.

First District (5th Division)    No. 78-48

Opinion filed June 22, 1979.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Francis X. Speh, Jr., and Pamela E. Loza, Assistant State's Attorneys, of counsel) for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:
After a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1) and sentenced to a term of 15 to 25 years. On appeal, defendant contends that: (1) he was not proven guilty beyond a reasonable doubt; (2) the trial court erred when it allowed his 1961 robbery conviction to be admitted into evidence; (3) the trial court erroneously denied his petition for discharge under the Fourth Term Act; (4) he was denied a fair trial when the State withheld an oral statement made by defendant; and (5) he was denied a fair trial when the State withheld the victim's clothing. We affirm as to all issues raised.

At approximately 3 p.m. on December 18, 1976, defendant stabbed James Green with a knife. Green died from wounds caused by the stabbing about nine hours later. The pertinent testimony follows.

*State's Case-in-Chief*
Officer Lawrence Thomas testified that at about 3 p.m. on December

18, he was sitting in his squad car which was parked on the north side of Madison Avenue, at about 2150 Madison; the car was facing westward and the window on the driver's side was partially opened. While finishing up a burglary report, he noticed two men, identified as defendant and Green, and a woman having a conversation on the south side of the street in front of 2151 Madison. The three of them were about 40 feet from Thomas. Thomas could see that defendant was wearing a three-quarter length coat and Green was wearing only a T-shirt, despite it being cold outside. Initially, Thomas did not pay too much attention to them. Shortly, however, he heard them arguing and began paying more attention. During the argument, defendant and Green were facing each other, with defendant facing west and only two feet separating them. The woman was standing about a foot behind defendant. While the two men argued, Thomas spent his time, alternately, filling out his report and watching the two men. He spent most of his time watching them. When the argument grew louder, he noticed defendant move his right hand to his left waistband and remove a hunting-type knife with a four-inch fixed blade. While defendant was taking out the knife, Green stood with his arms to his sides. Thomas stated that all during the incident he never saw Green reach out toward defendant. After defendant had removed the knife, he swung his right hand in an upper diagonal motion across Green's body. The knife struck Green and he "doubled over." As Green was falling, defendant again swung his right arm across Green's body. Thomas then left the squad car, drew his pistol, and radioed for assistance. He ran across the street to defendant. Defendant dropped his knife and started to turn toward his left, but he stopped when Thomas told him to halt. Defendant then assumed a search position, was handcuffed, and turned over to another policeman. When Thomas turned to Green, he noticed his guts hanging out of his lower abdomen. He also noticed that the woman who was with defendant and Green was "highly intoxicated."

On cross-examination, Thomas testified that cars were passing on Madison Avenue while he was observing the argument. He said that while defendant and Green were arguing, he could not make out the subject of their argument. He admitted that at a preliminary hearing he had testified that he had heard no conversation. Thomas said that when defendant swung his right hand at Green on the second occasion, defendant struck Green in the right bicep. His report of the incident, however, indicates that Green was wounded in the stomach and the left thigh. After the incident, defendant made no attempt to run away or to resist arrest. Later in the day, Thomas attempted to interview the woman, Anette Terrones, but she was incoherent because of her intoxication. Thomas said that he did not know if Green was intoxicated too. He stated that he never inventoried any of Green's clothes.

On redirect examination, Thomas testified that although there was traffic on Madison at the time of the incident, traffic was light and no cars were obstructing his view. Thomas noticed an odor of alcohol on defendant's breath, but he said that he thought that he had not been drinking heavily. He stated that although he noticed some blood by Green's bicep when he was on the ground, he never observed Green's actual injuries when he was unclothed. On recross examination, Thomas stated that his police report was in error and that he saw wounds in Green's stomach and his right bicep. He further stated that he had seen a laceration on Green's right bicep.

Johnnie Mae Brown, James Green's sister, testified that she saw her brother on December 12, 1976, and that he was in good health. On December 20 she identified the body of her brother in the Cook County Morgue.

Doctor Yuksel Konacki, a physician at the Cook County Medical Examiner's Office, testified that he conducted an autopsy on James Green on December 20. During his examination, he said that he saw Green's pants and shoes. His external examination revealed that Green was 5'9" tall and weighed 177 pounds. He had several "suture incisions" on his stomach and elbows. Konacki said that the incisions to the elbows were probably surgically related, but he did not rule out the possibility that they could have been caused otherwise. One of the incisions to the stomach was surgically related. Another incision was a stab wound located on the right side of the abdomen. This wound was two inches long and three inches deep and penetrated the abdominal wall into the abdominal cavity. An internal examination revealed that there were several wounds in the small intestines and the mesentery, the membrane which holds the intestines together. Konacki indicated that Green had died from the stab wound to the abdomen. He also indicated that Green's blood had been examined and a small amount of alcohol was found in his blood.

Stipulations were entered that Green was 49 years old and defendant was 54 at the time of the incident.

### Defense Case

Emmitt Goodloe, Green's roommate, testified that on December 17 he, Green, another man, and a woman were all drinking almost all night in their apartment at 2155 Madison. On December 18 the woman continued to drink, but Goodloe was not sure if Green had anything more to drink. Between 9 a.m. and 3 p.m., defendant had twice come to the apartment and on both occasions he was refused entrance by Green. Five minutes after the last refusal, Willie Bland came into the apartment and told Goodloe that Green had been stabbed.

Goodloe stated that he had known defendant for 10 years and Green

for six years. During the time that he had known both of them, he had never heard them argue. Goodloe also stated that Green was unemployed at the time of the incident.

Willie Bland testified that he saw defendant, whom he had known for 10 or 12 years, walking eastward on Madison sometime in the afternoon on December 18. At the time, Bland was standing behind a parked police car in which a police officer was seated. Bland said that as defendant was walking, a woman came out of a storefront and joined him. After defendant had passed 2155 Madison, Bland saw Green, whom he had known for 7 or 8 years, come out and walk quickly after defendant. Green eventually caught up with defendant, grabbed him by the back of his collar, and began talking to him. Bland could not hear any of the conversation. Eventually, defendant spun loose, but Green regained his grip on defendant's front collar. After Green had secured his grip, defendant unsuccessfully tried to hit Green in the head. Green then hit defendant in the side of his face. While this was going on, Bland did not notice which way the police officer was looking. After Green had hit him in the face, defendant hit Green in the stomach and Green fell to the ground. Bland then saw Green's guts on the ground. At that point, the police officer left his car and told defendant to drop his knife or "he'd blow his brains out." Bland said that after the incident he got drunk and he did not stop at Emmitt Goodloe's apartment. Although he did not like to say things about people he liked, Bland said that he understood that Green was a violent person. He also said that defendant had the reputation of being a peaceful man.

Defendant testified that he stood 5'10½" tall and weighed 140 pounds. He was suffering from spinal arthritis and had been a patient at the Municipal Tuberculosis Sanitarium for about seven years. He had been supporting himself by doing odd jobs.

On December 18 defendant was working at a tire shop at 2132 Madison. At about 2:30 p.m., he left the tire shop and went to a grocery store at 2208 Madison to purchase lunch. On the way back to the tire shop, a woman ran up to him and began walking with him. Then someone else ran up to him, grabbed his left wrist from behind, and held him in a "half nelson" type hold. Defendant managed to spin around and saw Green clutching his wrist. He noticed that Green was highly intoxicated and was wearing only a T-shirt, despite the cold weather. Green demanded that defendant give him a couple of dollars to buy another drink, but defendant told him that he did not have any money. Green then struck defendant on the side of his face and again demanded money. When defendant again claimed that he had no money, Green threatened him saying, "I know you got some money and you're going to give me some or else." Because he was scared, defendant reached his right hand into his jacket, pulled out a knife,

and stabbed Green in his lower right abdomen. After the stabbing, Green attempted to turn but, instead, he fell to the ground. When defendant turned north, he saw a police officer and he immediately dropped his knife and assumed a search position.

Defendant said that he had known Green for three or four years and that Green had a reputation in the community for being hostile and belligerent. He said that he was definitely afraid of Green. On two occasions prior to December 18, Green had demanded liquor money from him. On both previous occasions, he had given Green the money. Defendant admitted that in 1961 he had pleaded guilty to a charge of robbery.

On cross-examination, defendant testified that he used to see Green anywhere from two to five times a week over a period of four years. He used to see him at his apartment. He regarded Green as no more than a social acquaintance. He said that he never had any quarrels with Green and that there was never any physical violence or threats between the two of them.

Defendant also denied on cross-examination that he reached over to his left side to get the knife. He said that he pulled the knife out of the right pocket of a jacket which he was wearing under his three-quarter length coat. He denied that he made a sweeping motion with his arm across Green's body. He said that he only stabbed Green once and that he did not intend to stab him deeply. He only stabbed Green so that he would release him. Defendant claimed that he carried the knife with him because he used it to pull tires off rims at work. When he was arrested after the stabbing, he told the police that he stabbed Green out of self-defense. He did not tell the police officers that Green tried to get money from him. He did not recall if he told the police that he saw Green threaten the woman with a knife, but if he did, it was not true. He admitted telling the police that he took the knife from Green, but said that was untrue. He explained that he was afraid when he first spoke with the police.

Several character witnesses were called by the defense. James Love, defendant's employer for four years, testified that in his opinion both defendant and Green were peaceful men. Mildred King, defendant's landlady and part-time employer, testified that defendant had the reputation of being peaceful and that Green had the reputation of being violent. The Reverend Hanley Caldwell, a minister of a church on Madison, testified that defendant had a peaceful reputation and that Green had a violent reputation.

### State's Rebuttal

Officer Robert Wasmund testified that he spoke with defendant at about 5 p.m. on December 18. Defendant gave him a statement as to what

had occurred earlier. He told Wasmund that Green had brandished a knife and grabbed the woman. He interceded, took the knife away from Green, and stabbed him only once. Although it was Wasmund's policy to put such statements in his police report, he admitted that he had not included this statement in his report. He said that his report was only a summation. He did say, however, that he took notes on a scratch pad while he was talking to defendant and that these notes contained references to the threat on the woman.

Wasmund also stated that he did not inventory Green's clothes. He said that under a new police procedure, the police did not obtain clothing until after the medical examiner has posted the body. He had a notation on his scratch pad that the clothes were cut off and discarded.

OPINION

Defendant initially contends that he was not proven guilty of murder beyond a reasonable doubt. He argues that the testimony of Officer Thomas was so uncertain, contradictory, and improbable as to warrant a reversal. He further argues that the testimony of his witnesses, particularly the testimony of the reputation witnesses, cannot be discounted. We disagree.

■■ In a murder prosecution, the credible testimony of a single eyewitness is sufficient to convict if the witness views the crime under circumstances which would allow a positive identification. (*People v. Horton* (1976), 43 Ill. App. 3d 150, 356 N.E.2d 1044.) Questions of credibility are for the trier of fact. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

Defendant argues that Officer Thomas was not in a position to view the circumstances surrounding the stabbing. Thomas testified that at about 3 p.m. he was parked on the north side of Madison Avenue, a through street with light traffic, directly across from and within 40 feet of the scene of the crime. While he was parked, he was dividing his attention between filling out a report and watching the argument across the street. He stated that all during the argument, he never saw Green reaching out toward defendant. As the argument grew louder, he saw defendant reach into his left waistband, pull out a knife, and stab Green first in the stomach and then in the right bicep.

Defendant states that Thomas' testimony is to be disbelieved because "he was facing straight ahead as he sat at the driver's wheel on Madison Street which was heavy with traffic and he was writing a case report." None of these claims are completely supportable by the record. Thomas testified that traffic was light and Willie Bland, who also claimed to have seen the incident from a vantage point behind the police car, did not dispute this testimony. Although Bland testified that he initially saw Thomas facing straight ahead in the police car, he stated that while punches were being

exchanged he did not notice which way Thomas was looking. Thomas' testimony also contradicts the charge that he was looking straight ahead when the events transpired. Also, although Thomas testified that he was working on a police report, he never said that his full attention was distracted from the events which transpired across the street. In fact, he stated that even before the stabbing, he spent most of his time watching the argument.

Defendant argues that Thomas should be disbelieved because he testified that there were two stabbings, when in fact there was only one, and because he testified at trial that the second stabbing was to the right bicep whereas his police report of the incident indicated that the stabbing was to the left thigh. There is some testimony in the record to support Thomas' claim that there were two stabbings. Doctor Konacki testified that his external examination of Green revealed several "suture incisions." He clearly identified one of the incisions as a stab wound and when asked about the other incisions, he said that they were probably surgically related but he could not rule out the possibility that they could have been caused otherwise. Further, we believe that even if there had not been a second stabbing, Thomas' statement that there was a second stabbing would only go to his credibility. As far as the contradiction between his trial testimony and his police report is concerned, we believe that within the context of this case the contradiction was no more than a minor discrepancy going to the question of Thomas' credibility. *People v. Green* (1978), 62 Ill. App. 3d 420, 379 N.E.2d 119.

Defendant argues that Thomas is not to be believed because the testimony of the defense witnesses, particularly the reputation witnesses, is not to be discounted. Although defendant's witnesses do almost consistently portray defendant as a peaceful man who struck only in self-defense and Green as a violent man who attacked defendant, we do not believe that their testimony was so strong as to be believed. For example, Emmitt Goodloe, Green's roommate, testified that Bland ran into his apartment only five minutes after defendant had been refused entrance to the apartment by Green and told him about the stabbing. Yet, Bland testified that he never ran into the apartment to tell Goodloe about the incident. He also did not see defendant seek to enter the apartment. Bland testified that he got drunk after the stabbing.

Defendant's reputation witnesses, although in agreement as to defendant's reputation, were not in total agreement as to Green's reputation. James Love, defendant's employer, testified that both Green and defendant were peaceful men. Further, even if the witnesses had been uniform in their opinions as to defendant and Green's respective reputations, their testimony cannot overcome the positive testimony of an eyewitness. (See *People v. Lonzo* (1974), 20 Ill. App. 3d 721, 315 N.E.2d

256.) *People v. Ricili* (1948), 400 Ill. 309, 79 N.E.2d 509, cited by the defendant, is distinguishable on the basis that in that case the prosecutrix's identification was not positive.

Defendant's own testimony is contradictory, inconsistent with the testimony of another witness, and lacking in certain key explanations. At trial, defendant testified that he took the knife out of his pocket and stabbed Green. Yet, he admitted telling a police officer after the incident that he took the knife from Green and then stabbed him. He testified that Green grabbed his left wrist and never let go during the incident. Yet, Bland, an eyewitness who the defense claims to have seen everything, testified that Green first grabbed defendant by the back collar and then grabbed him by the front collar. Also, defendant did not explain why he did not tell the police that Green had demanded money from him, even though he had told them it was self-defense, and he did not explain why he was walking down the south side of Madison, after coming from a grocery store, on the north side of Madison, and returning to his place of employment which was also on the north side of Madison.

In light of the positive testimony of Officer Thomas and the various gaps and inconsistencies in the testimony of defense witnesses, we cannot say that the evidence is so unsatisfactory as to justify a reasonable doubt of guilt. Therefore, we reject defendant's contention that he was not proven guilty beyond a reasonable doubt.

Defendant next contends that his 1961 robbery conviction based on a plea should not have been received in evidence because it was hardly probative and indeed prejudicial to his cause. Although defendant was convicted in 1961, he was not released from custody for that offense until 1968, which is the key date for application of the *Montgomery* rule. (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695.) At the trial of the instant case, the court denied defendant's motion in limine and permitted use of his 1961 conviction for impeachment purposes only. Subsequently, the defense elicited information about the conviction on direct examination of defendant.

A prior conviction, is of course, admissible for impeachment purposes if the conviction meets the standard set forth in *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695. In determining whether the probative value of the conviction is substantially outweighed by the danger of unfair prejudice, the following factors are considered: (1) nature of prior crimes; (2) length of past criminal record; (3) age and circumstances of defendant; (4) likelihood that defendant would not testify if the court allows the prior conviction into evidence; (5) nearness or remoteness of prior conviction; (6) defendant's subsequent career; and (7) similarity of prior crime to the one charged. (*People v. Belvedere* (1979),

72 Ill. App. 3d 998, 390 N.E.2d 1239.) In applying these factors to the present case, we believe that the prior conviction was properly admitted for impeachment purposes only. The 1961 conviction was for robbery, a crime which relates directly to credibility. (*People v. Ridley* (1975), 25 Ill. App. 3d 596, 323 N.E.2d 577.) We think that it was proper to admit this prior conviction even though the conviction was based on a plea. (*Ridley.*) We also think that a charge of robbery is sufficiently dissimilar from the present charge so that the danger of defendant's being convicted of murder on the basis of the former charge is slight. We note that defendant was convicted of robbery at age 38 and thus, he cannot argue that his young age is a mitigating factor. Also, he was released from prison in 1968, eight years prior to the instant stabbing incident. *Montgomery* only requires that the release from confinement occurred within 10 years. Further, although it is true that defendant had not been convicted of any crime in the interim, he had a number of convictions prior to the 1961 offense. Thus, his 1961 conviction was not his only conviction prior to the instant stabbing and had some probative value. Finally, considering the self-defense theory of the defense, we do not think that it is likely that the admission of the prior conviction affected defendant's decision to take the witness stand.

Defendant contends that his petition for discharge under the Fourth Term Act was erroneously denied when he was in custody for over 153 days without being tried. Section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5) provides that an accused be tried within 120 days of his being taken into custody unless he is responsible for the delay. Defendant was taken into custody on February 16, 1977, and he had not been tried by July 19, 1977, the date of his petition for discharge. Defendant argues that none of the delays which occurred during this 153-day period were attributable to him and thus, his petition for discharge should have been granted. We disagree.

On April 25, defendant appeared at a scheduled court hearing without his court-appointed attorney present. At no time prior to the scheduled hearing did defendant's attorney explain his inability to appear at the hearing. After the trial court noted the attorney's absence, the following colloquy transpired:

"The Court: All right. Mr. Spurlark, I take it you don't want to proceed without your lawyer?

A: No, sir.

The Court: So, I will make—I'll enter a motion for continuance by you, but I'll make it for one week and I will call Mr. Connolly [his attorney] myself.

Mr. Spurlark: Thank you, sir.

The Court: Motion defendant May 2, 1977."

■■ Delays occasioned by the failure of defense counsel to appear at a hearing are attributable to defendant. (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 136, 91 S. Ct. 1657; *People v. Howard* (1975), 34 Ill. App. 3d 145, 340 N.E.2d 53.) When a delay is occasioned by defendant, a new 120-day period begins to run at the end of the delay. (*People v. Gooding* (1975), 61 Ill. 2d 298, 335 N.E.2d 769.) Nonetheless, defendant argues that this delay should not be attributable to him because (1) the April 25 hearing was not a date set for trial but was, instead, a date set without subpoenas; (2) he was not represented by a counsel of his own choosing but, instead, had to accept the legal counsel which was given to him by the court; and (3) his appointed counsel proved to be ineffective or incompetent.

■■ The fact that the April 25 court date was set without subpoenas has no bearing on whether the delay is attributable to defendant. Section 103—5 requires only that an accused be tried within 120 days of being taken into custody. A continuance for whatever reason shortens the 120-day period if caused by the State and results in the running of a new 120-day period, if caused by defendant. Furthermore, defendant did indicate to the court that he did not want to proceed; so, it does not really matter whether the date had been set for trial.

The fact that defendant was represented by appointed counsel has no bearing on the delay unless, of course, defendant can establish that the attorney was incompetent. The rule for establishing inadequacy of appointed counsel in Illinois is:

> "[D]efendant must clearly demonstrate: '(1) actual incompetence of counsel, as reflected by the manner of carrying out his duties as a trial attorney; and (2) substantial prejudice resulting therefrom, without which the outcome would probably have been different.'" (*People v. Logue* (1970), 45 Ill. 2d 170, 172, 258 N.E.2d 323, 324.)

Defendant bases his claim of incompetence on his attorney's failure to appear on April 25 and his attorney's failure to file timely motions at certain points in the trial. In particular, he refers to the trial court's rebuke of counsel for his failure to promptly notify the court that defendant's 1961 conviction was based on a plea without assistance of counsel, to notify the court that the State had promised to produce Green's clothing but had not done so, and to object to the introduction of Officer Wasmund's testimony on the contents of his personal scratch notes.

■■ During the hearing on defendant's post-trial motion, defense counsel argued that in light of the United States Supreme Court decision in *Loper v. Beto* (1972), 405 U.S. 473, 31 L. Ed. 2d 374, 92 S. Ct. 1014, a hearing should have been held on the admissibility of the 1961 conviction because when

defendant entered his plea in that case he was not represented by counsel. Defense counsel's argument was the first time that the court had heard of the absence of counsel. When the court asked counsel why he had not mentioned this before, counsel responded that he did not know of this until just before defendant took the witness stand. He said that when he discovered that defendant had not been represented by counsel, it raised a question in his mind, but he did not become aware of the *Loper* case until he began researching his post-trial motion. Defense counsel did not become aware of the absence of counsel because he had not been handed the transcript of the proceeding until just before defendant took the witness stand.

Although we believe that counsel should have apprised the court as soon as a question arose, we do not believe that his actions constitute incompetency. We note further, however, that the court subsequently reviewed the transcript and discovered that defendant had waived his right to counsel. Additionally, we note that the evidence in this case was not such that a ruling that the conviction was inadmissible would have changed the outcome.

During the hearing on the post-trial motion, defense counsel contended that the State had failed to produce Green's clothing at trial. Once again, the court was not apprised of this during the course of the trial. Nonetheless, even though counsel should have informed the court of this problem sooner, we do not believe that the clothes were so important to this case that defendant's lack of diligence rises to the level of incompetency. The only purpose which the clothing could have served would have been to indicate the number of stab wounds. Several witnesses had already testified to this and there was a conflict in testimony. Yet, this conflict really was not that important because the only wound that really mattered was the first wound which caused Green's death and that wound is undisputed.

Defendant also argues that his counsel was incompetent due to his failure to object to Wasmund's testimony on the contents of his personal scratch notes. Although, as will be discussed in the context of defendant's next contention, we find that this testimony was improper, the error in admitting this testimony was harmless. Therefore, defendant's failure to object did not result in such prejudice without which the outcome probably would have been different.

■■ We conclude that defense counsel's failure to appear resulted in a delay attributable to defendant and thus the 120-day period began to run anew as of May 2. Therefore, the trial court did not err when it denied defendant's petition to discharge, only 78 days later.

Defendant contends that he was denied a fair trial when the State withheld an oral statement from him until just after he had testified. He

filed a pretrial motion for discovery requesting all of his statements, oral and written. The State's answer included a police report which indicated that defendant had told the police that Green had pulled a knife on him and that he had taken the knife away and then stabbed him in self-defense. The report also included the name of "Annetta" Terrones as a witness. Defendant was asked on cross-examination if he had told the police that Green had threatened Terrones with a knife and that he took the knife away from Green and then stabbed him. On rebuttal, Officer Wasmund testified that defendant had in fact given this statement to him. He said that he did not include this information on his police report, but that he kept notes on a scratch pad during the interview and said that he had the scratch pad with him. Defendant's attorney swore out an affidavit that he had not been tendered the statement on the scratch pad until after defendant had concluded his testimony. The State "thought" that they had tendered the statement to defendant sooner than that and explained that they had not given the statement in response to defendant's motion because they were not aware of it until they had interviewed Officer Wasmund in preparation for his testimony. They claim that they tendered the statement at the earliest possible moment thereafter. We conclude that the use of the statement by the State, without earlier disclosure, was error, but the error was harmless.

■■ ■ Section 114—10 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 114—10) provides:

"(a) On motion of a defendant in any criminal case made prior to trial the court shall order the State to furnish the defendant with a copy of any written confession made to any law enforcement officer of this State or any other State and a list of the witnesses to its making and acknowledgment. If the defendant has made an oral confession a list of the witnesses to its making shall be furnished.

* * *

(c) No such confession shall be received in evidence which has not been furnished in compliance with subsection (a) of this Section unless the court is satisfied that the prosecutor was unaware of the existence of such confession prior to trial and that he could not have become aware of such in the exercise of due diligence."

For purposes of section 114—10, a confession includes both inculpatory and exculpatory statements. (*People v. Thompson* (1974), 18 Ill. App. 3d 613, 310 N.E.2d 504.) The statement in issue here was an exculpatory statement and, as such, should have been produced in response to defendant's motion. Nonetheless, the State argues that they produced the statement as soon as possible after they had been informed of the

statement by Officer Wasmund. We do not believe that such an explanation is acceptable here. It is not an excuse that the police did not inform the State of the statement sooner. (*People v. Young* (1978), 59 Ill. App. 3d 254, 375 N.E.2d 442.) Therefore, the statement should not have been received into evidence.

Although the statement should not have been received into evidence, the error was harmless. It was harmless because defendant denied making the statement and because defense counsel effectively impeached Wasmund on his failure to include the statement in his report. It was also harmless because of the nature of the evidence in this case.

Defendant also contends that he was denied a fair trial when the State withheld Green's clothing from him. In their answer to defendant's discovery motion, the State indicated that they would produce the clothing at trial. The State's Attorney allegedly assured defense counsel that it would be produced. Despite this assurance, the clothing was never produced. Defendant argues that the clothing should have been produced because it "would have bolstered the defense case to point out yet another incongruity or falsehood [in Officer Thomas' testimony] should the deceased's clothing have evidenced one tear instead of two."

In answer to defendant's contention, we first note that the State cannot be accused of withholding evidence where neither the State nor its agents are in possession of the evidence. (*People v. Berry* (1977), 54 Ill. App. 3d 647, 370 N.E.2d 26.) In the present case, there is no evidence that the State or its agents were in possession of the clothing. Officers Thomas and Wasmund testified that they never inventoried any of Green's clothing. Wasmund stated that under a new police procedure, the police do not receive the clothing until the body has been posted by the medical examiner. He claimed that he had never received the clothing. He further stated that he had a notation on his scratch pad that the clothes were cut off and discarded. Doctor Konacki testified that he had seen Green's shoes and pants when he conducted his autopsy, but he did not say what had happened to those items of clothing. Since there is no evidence that the State or its agents possessed the clothing, the State cannot be charged with withholding evidence. Also, as noted previously, we do not believe that the clothing had such obvious value that the clothing was absolutely necessary for the defense.

On this record, we see no reason to reverse.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.